2019 IL App (1st) 171929-U
Order filed: October 25, 2019

FIRST DISTRICT
FIFTH DIVISION

No. 1-17-1929

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 10 CR 15949 |
| | ) | |
| DANTE SMALL, | ) | Honorable |
| | ) | Mary Margaret Brosnahan, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Hoffman and Justice Delort concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirmed the summary dismissal of defendant's post-conviction petition where his legal theory and factual allegations were contradicted by the record.

¶ 2    A jury convicted defendant, Dante Small, of two counts of attempted murder and one count of aggravated battery of a peace officer. The trial court merged the aggravated battery conviction into the attempted murder conviction for the same officer and sentenced defendant to two consecutive terms of 20 years' imprisonment. On direct appeal, this court affirmed. See *People v. Small*, 2014 IL App (1st) 130190-U. Defendant subsequently filed a *pro se* post-conviction petition, alleging ineffective assistance of trial counsel, which the circuit court summarily dismissed. Defendant now appeals the summary dismissal, arguing that his post-

conviction petition contains an arguable basis in law and fact such that it should not have been dismissed. We affirm.[1]

¶ 3    Defendant was charged with four counts of attempted murder of a peace officer and two counts of aggravated battery of a peace officer. At a pretrial hearing on April 27, 2012, at which defendant was present, the assistant State's Attorney informed the court that the State was proceeding on two counts of attempted murder of a peace officer and one count of aggravated battery of a peace officer. The following colloquy then ensued:

"THE COURT: Now, what about any needs for *Curry* [*People v. Curry*, 178 Ill. 2d 509 (1997)] admonishments? The defendant is charged with attempt first degree murder of a police officer, which if convicted here is a minimum sentence of 21 years on the bottom. Are there any need for *Curry* admonishment? Have you made any offers less than that?

DEFENSE COUNSEL: Judge, we have not been made an offer at this point.

THE COURT: And you have not asked for an offer up to this point?

DEFENSE COUNSEL: No, I haven't.

ASSISTANT STATE'S ATTORNEY: I think the minimum was 20, Your Honor. We did make an offer of 20.

DEFENSE COUNSEL: You did? Oh, but that's not below the minimum.

ASSISTANT STATE'S ATTORNEY: That's not below, that's the minimum.

THE COURT: So you had an offer of what?

ASSISTANT STATE'S ATTORNEY: Twenty.

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order stating with specificity why no substantial question is presented.

THE COURT: Your offer was 20?

ASSISTANT STATE'S ATTORNEY: Yes.

DEFENSE COUNSEL: On the primary charge.

ASSISTANT STATE'S ATTORNEY: Exactly.

THE COURT: Okay.

DEFENSE COUNSEL: Which has been rejected.

THE COURT: It's been rejected. So everybody is ready to go forward?

DEFENSE COUNSEL: Yes."

¶ 4    The cause proceeded to trial.

¶ 5    At trial, Tabitha Washington testified that in July 2010 she owned a silver Chevy Monte Carlo. On July 31, 2010, Tabitha went to her building parking lot and discovered that her car was missing. On August 3, 2010, between 5 and 6 p.m., Tabitha received a phone call from her father. Following their conversation, Tabitha and her boyfriend, Danny Lauderdale, drove in separate cars to the intersection of 79th Street, Stony Island Avenue, and South Chicago Avenue, where she observed her car with two people inside. The driver was an African American male. Tabitha began following the car and called 911. Danny also followed the car. Tabitha and Danny followed the car for about 15 minutes until they were curbed by police.

¶ 6    Sergeant Cornelius Brown testified that at about 1 a.m. on August 4, 2010, he was in an unmarked squad car and in civilian dress. He received a call that the owners of a stolen vehicle were following that vehicle near 75th Street and Colfax Avenue. Sergeant Brown went to that location and saw a silver Monte Carlo being followed by two other cars.

¶ 7    Sergeant Brown activated his lights to curb the vehicles. Tabitha and Danny eventually pulled their vehicles over. Sergeant Brown continued following the Monte Carlo with his lights

and siren activated. The Monte Carlo accelerated and attempted to elude him. Sergeant Brown pursued the Monte Carlo for about 15 minutes before losing sight of it. Sergeant Brown then contacted Officers Courtney Hill and Dwayne McGee and asked for their assistance.

¶ 8    Officer Hill testified that at approximately 1 a.m. on August 4, 2010, he and his partner, Officer McGee, received a call from Sergeant Brown asking for help in locating a stolen vehicle, a silver Monte Carlo, east on 79th Street. Officers Hill and McGee were dressed in plain clothes, wearing vests that said "police" on the back. The front of their vests had a patch with a star on it that said "Chicago Police." Each officer was wearing a belt containing a radio, gun, flashlight and handcuffs.

¶ 9    Officer Hill testified that after receiving the call, they proceeded to a three-way intersection at 79th Street, Stony Island Avenue, and South Chicago Avenue in an unmarked vehicle. Officer Hill was driving. When they arrived at 79th Street, they saw the silver Monte Carlo stopped at a light on South Chicago Avenue. There were two people in the Monte Carlo. Officer Hill identified defendant in court as the driver. Officer Hill activated his emergency lights, drove in front of the Monte Carlo, and angled his car to prevent it from fleeing.

¶ 10    Officer Hill and Officer McGee exited their police car. Officer Hill went to the back of the police car and faced the Monte Carlo. He had his weapon drawn and pointed at the ground. Officer Hill saw the Monte Carlo go in reverse, then move forward. Officer Hill shot at the defendant because he "was coming at me." Officer Hill had no time to move out of the way, and therefore was struck by the Monte Carlo. The Monte Carlo never slowed down at all.

¶ 11    Officer Hill testified that after the Monte Carlo hit him, he "flipped onto the hood, and off to the side, and *** rolled over a couple times." Defendant then drove away. Officer Hill tried to

get up, but his knee was now causing him "excruciating pain" and he fell back to the ground. An ambulance took him to the hospital, where he learned that his knee was broken in two places. Officer Hill went to the police station on August 13, 2010, and identified defendant in a lineup as the person who was driving the vehicle that struck him.

¶ 12    Officer McGee testified that after driving their police car in front of the Monte Carlo, he and Officer Hill exited their vehicle. Officer McGee had his weapon in his hand, pointed to the ground.  Officer McGee announced his office and told defendant and his companion to put their hands up. Defendant did not comply. Officer McGee saw the Monte Carlo begin to "go into reverse." Officer McGee continued to say "let me see your hands." The Monte Carlo stopped going in reverse and began to move forward, directly toward Officer McGee, at a fast rate of speed. Defendant did not attempt to drive the Monte Carlo around Officer McGee. Officer McGee fired his weapon toward the Monte Carlo and was able to get out of the way without being hit. Officer McGee saw the Monte Carlo "continue to accelerate" and strike Officer Hill. Officer McGee did not see the Monte Carlo slow down, or attempt to swerve out of the way of Officer Hill.

¶ 13     Officer McGee testified that after the Monte Carlo struck Officer Hill, it made a left turn and went southbound on Stony Island Avenue. Officer McGee went over to Officer Hill and saw that his leg "looked deformed." Officer McGee called for an ambulance.

¶ 14    On August 13, 2012, Officer McGee went to the police station and identified defendant in a lineup as the driver of the silver Monte Carlo.

¶ 15    A videotape of the incident, recorded by a traffic camera, was admitted into evidence and played for the jury. The videotape corroborates the testimony of Officer Hill and Officer McGee regarding how they pulled their car in front of the Monte Carlo and exited their vehicle, after

which defendant drove toward Officer McGee, causing him to fire his weapon and jump out of the way. The video then depicts the Monte Carlo driving directly at Officer Hill, striking him and causing him to roll over the front of the car.

¶ 16    After the video was played for the jury, Officer Otis Wells testified that at approximately 1:27 a.m. on August 4, 2010, he heard a radio transmission of a stolen vehicle and that officers were following three vehicles at a high rate of speed. A Monte Carlo was the lead car being pursued. Officer Wells later heard another radio transmission that the Monte Carlo had been stopped in the area of 79th Street and South Chicago Avenue.

¶ 17    Officer Wells activated his emergency lights and proceeded to 79th Street and South Chicago Avenue, where he observed an unmarked police car with its lights flashing, parked in front of a Monte Carlo at an angle. As Officer Wells approached the intersection, he heard gunfire and saw the Monte Carlo "take[] off" and strike Officer Hill. Officer Wells testified he did not see the Monte Carlo slow down or attempt to swerve out of the way of the police car.

¶ 18    Officer Wells saw Officer Hill roll onto the hood of the Monte Carlo and fall to the ground. Officer Wells took out his gun and fired two shots at the Monte Carlo. The Monte Carlo then went northwest on South Chicago Avenue and turned south on Stony Island Avenue. Officer Wells pursued the Monte Carlo at a speed of over 80 miles per hour, but he was unable to catch up. He estimated that the Monte Carlo was driving about 100 miles per hour.

¶ 19    Max Brown, the passenger in the Monte Carlo, testified that a little after midnight on August 4, 2010, he was "hanging out" and smoking cigarettes when defendant drove up to him. Max did not remember the color or make of the car defendant was driving. Max entered the car and he smoked marijuana with defendant.

¶ 20     Max testified they were stopped at a red light in the area of 79th Street and Stony Island Avenue when a police vehicle came up behind them. After about five seconds, the police vehicle moved in front of them. Defendant put their car in reverse. Max heard an officer say, "Put your hands up." As they were reversing, Max heard gunshots and was shot in the forearm.

¶ 21     Max testified he ducked under the dashboard and therefore did not know whether defendant subsequently drove directly at the police officers. Max later jumped out of the car and was found by the police, who beat him and took him into custody.

¶ 22     Max went to the hospital and then to the police station, where he met with two detectives and Assistant State's Attorney (ASA) Armbrust. Max made a statement that ASA Armbrust wrote down and typed out. ASA Armbrust testified that Max never told her that the officers had beaten him.

¶ 23     According to ASA Armbrust, Max stated that defendant was driving a Monte Carlo and pulled over to talk to him. Max entered the vehicle. A police car began following them. The police car eventually "blocked" defendant's car and then an officer exited and stated, "Stop the car, put your hand up." Defendant drove the Monte Carlo in reverse for a few feet, then put it into drive and drove directly towards the police officer. Max heard a lot of gunshots and tried to duck down.

¶ 24     Max testified that People's exhibit number 15 was his statement and he acknowledged his signatures and initials throughout the statement. Max testified that "some of the things in [the statement] were changed around." Specifically, Max denied stating that: defendant's car was a Monte Carlo; that defendant thought a car was following them; that the intersection at which they were stopped was brightly lit and that he saw the officers were wearing bullet proof vests; that he saw an officer get out of the unmarked police car and say "Put your hands up"; and that

defendant drove the car in reverse for a few feet, then put the car in drive and drove directly toward the police officer.

¶ 25 Detective Patrick Ford testified that on August 12, 2010, he learned that defendant had been taken into custody. The following day, Officer Hill and Officer McGee separately viewed a lineup and each identified defendant.

¶ 26 Following the close of the State's evidence, defendant testified on his own behalf. Defendant testified that at about noon on August 3, 2010, he saw Marvin Patterson at a corner store with a silver Monte Carlo. Marvin told defendant that the car belonged to his daughter, who was out of town, and that for $20 he would lend defendant the car for the day. Defendant accepted and got in the car with Marvin.

¶ 27 Defendant testified they drove to Marvin's apartment building. Marvin exited the car, gave defendant his phone number, and told defendant to call him when he was ready to return the car. Defendant then drove to his house, went grocery shopping and returned to his house around 2 p.m. After about an hour or two, he went to a friend's cousin's house and smoked weed. Defendant stayed there a couple of hours, then met up with a "lady friend" and drove away from her house at around midnight.

¶ 28 As he was driving, defendant saw Max Brown on 75th Street and Colfax Avenue. Max got into the car and they went around the block and smoked weed. Max asked defendant to drop him off at his girlfriend's house. As they were driving to that location, defendant stopped at a red light at the intersection of 79th Street and South Chicago Avenue. Defendant saw an unmarked police car come up behind him. Defendant thought the officers were "running" his license plate, but he was not concerned because he was unaware that the car had been reported stolen.

¶ 29    Defendant testified that the police car pulled in front of him and "cut the front of the car off." One of the officers opened the door of the police car and stepped out. Defendant was afraid he would get in trouble for smoking weed and/or that the car would be impounded, so he put the car in reverse in an attempt to flee. Defendant then stopped the car and turned the steering wheel to the left. At that point, as the car was stopped, the officers started shooting at him. Defendant ducked down, put the car in drive, and "hit the gas." He heard a "thump" but he was still ducked down and did not know that he had hit one of the officers. As the car moved forward, defendant did not look up because he was too scared.

¶ 30    Defendant further testified that he finally looked up when he reached the middle of the intersection.  Defendant took a left turn at the intersection, and he heard police shooting at the back of his car. Police chased him for approximately 15 minutes until he was able to elude them. Defendant let Max out of the car in an alley.

¶ 31    Defendant testified he did not intend to kill any of the police officers and that he had only intended to go around them and drive away. Defendant admitted he had previous convictions for possession of a controlled substance and unlawful use of a weapon.

¶ 32    Defendant testified he was later arrested and taken to the police station, where he spoke with Detective Ford at about 3 a.m. on August 13, 2010. Defendant denied telling Detective Ford that he had never been in the Monte Carlo.

¶ 33    In rebuttal, Detective Ford testified he interviewed defendant at the police station at about 3 a.m. on August 13, 2010, and defendant stated he had never been in a silver Monte Carlo at any time.

¶ 34    Officer Hill testified he saw defendant's face as he was driving towards him, and that defendant was not ducking down.

¶ 35    Officer McGee also testified he saw defendant's face as he was driving towards him, and that defendant was not ducking down.

¶ 36    Thereafter, the State introduced a certified copy of defendant's 2006 conviction for possession of a controlled substance and a certified copy of defendant's 2008 conviction for aggravated unlawful use of a weapon. The State rested in rebuttal. Following closing arguments, the jury convicted defendant of aggravated battery to Officer Hill, the attempted murder of Officer Hill, and the attempted murder of Officer McGee.  The trial court merged the aggravated battery conviction into the attempted murder conviction with respect to Officer Hill and sentenced defendant to two consecutive terms of 20 years' imprisonment.

¶ 37    Defendant filed a direct appeal, arguing that: (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the trial court erred by admitting irrelevant evidence; (3) the State made improper remarks during opening statement and closing argument; (4) defense counsel provided ineffective assistance by failing to question Officers Hill and McGee about their possible motives to testify falsely, and by failing to examine the officers regarding an investigation of the shooting by the Independent Police Review Authority; (5) the State committed a discovery violation; and (6) his sentence violated the proportionate penalties clause. *Small*, 2014 IL App (1st) 130190-U, ¶ 2. This court affirmed. *Id.* ¶ 119.

¶ 38    On April 5, 2017, defendant filed his *pro se* post-conviction petition. In pertinent part, defendant alleged that his trial counsel committed ineffective assistance during plea negotiations by giving him wrong information. Specifically, defendant contended that his counsel informed him that the State offered him 10-years' imprisonment for pleading guilty to aggravated battery in exchange for the dropping of the attempted murder charges, but that he rejected the deal because his counsel wrongly informed him that he faced a potential sentence of 6 to 30 years'

imprisonment on all the charges, when in fact he faced a sentencing range of 20 to 80 years' imprisonment. Defendant also contended that his counsel never told him that his sentence would run consecutively if he rejected the plea offer and was convicted on all charges. Defendant argued that had he known he was subject to a minimum 20-year sentence on each count of attempted murder of a peace officer, and that the sentence would run consecutively, he would have accepted the 10-year offer.

¶ 39    The post-conviction court found that defendant's claim was frivolous and patently without merit, and summarily dismissed defendant's post-conviction petition at the first stage of the proceedings. Defendant appeals.

¶ 40    A post-conviction petition is a collateral attack on a conviction and sentence and is limited to constitutional matters that have not been, nor could have been, previously decided. *People v. Logan*, 2011 IL App (1st) 093582, ¶ 30. In a noncapital case, the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)) provides a three-stage process for post-conviction relief. At the first stage, the court examines the petition to determine only if it is frivolous or patently without merit. *Logan*, 2011 IL App (1st) 093582, ¶ 30. A petition may be summarily dismissed at the first stage as frivolous or patently without merit if the petition has no arguable basis either in law or in fact (*People v. Hodges*, 234 Ill. 2d 1, 11-12 (2009)), *i.e.*, if it was based on an indisputably meritless legal theory or a fanciful factual allegation. *Id.* at 16. An example of an indisputably meritless legal theory is one that is completely contradicted by the record. *Id.* Fanciful factual allegations include those that are "fantastic or delusional." *Id.* at 17. We review the summary dismissal of a post-conviction petition *de novo*. *People v. Tate*, 2012 IL 112214, ¶ 10.

¶ 41    Generally, " '[a]t the first stage of postconviction proceedings under the Act, a petition alleging ineffective assistance may not be summarily dismissed if (i) it is *arguable* that counsel's performance fell below an objective standard of reasonableness and (ii) it is *arguable* that the defendant was prejudiced.' " (Emphases in original.) *Id.* ¶ 19 (quoting *Hodges*, 234 Ill. 2d at 17). However, to avoid summary dismissal, defendant's petition is also required by section 122-2 of the Act to "have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2016). The purpose of section 122-2 is to establish that the allegations in the petition are capable of objective or independent corroboration. *People v. Delton*, 227 Ill. 2d 247, 254 (2008). Therefore, "the affidavits and exhibits which accompany a petition must identify with reasonable certainty the sources, character, and availability of the alleged evidence supporting the petition's allegations." *Id.* The failure to attach the necessary "affidavits, records, or other evidence" (725 ILCS 5/122-2 (West 2016)) or explain their absence is "fatal" to the post-conviction petition and " 'by itself justifies the petition's summary dismissal.' " *Delton*, 227 Ill. 2d at 255 (quoting *People v. Collins*, 202 Ill. 2d 59, 66 (2002)).

¶ 42    In addition to the pleading requirements of section 122-2, section 122-1(b) of the Act states that "[t]he proceeding shall be commenced by filing with the clerk of the court in which the conviction took place a petition (together with a copy thereof) verified by affidavit." 725 ILCS 5/122-1(b)(West 2016). Unlike the section 122-2 affidavit, which shows that defendant's allegations can be objectively and independently corroborated, the verification affidavit requirement of section 122-1, "like all pleading verifications, confirms that the allegations are brought truthfully and in good faith." *People v. Collins*, 202 Ill. 2d 59, 67 (2002).

¶ 43     In the present case, the State argues that the summary dismissal of defendant's petition was justified because there is no evidence in the appellate record that his claim of ineffective assistance was supported by section 122-2 affidavits showing that it can be objectively and independently corroborated. Although defendant's petition states "See Exhibit (C) for affidavits on this issue," Exhibit (C) does not appear in the record on appeal. As the appellant, defendant bears the burden of providing a sufficiently complete record to support his claim of error, and any incompleteness in the record is resolved against him.  See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). The State contends that in the absence of any section 122-2 affidavits, the post-conviction court's summary dismissal of defendant's petition was justified. See *Delton*, 227 Ill. 2d at 255.

¶ 44     Defendant argues, though, that our supreme court has carved out an exception to the section 122-2 affidavit requirement, specifically, that the court has held that defendant need not provide an affidavit from his trial attorney admitting to the facts supporting the claim of ineffective assistance against him. See *People v. Williams*, 47 Ill. 2d 1, 4 (1970) ("The difficulty or impossibility of obtaining such an affidavit is self-apparent."); *People v. Hall*, 217 Ill. 2d 324, 333-34 (2005) (same). Defendant argues that, at best, he was required to provide only his own affidavit asserting the facts supporting the claim of ineffective assistance. Defendant contends that he met this requirement by providing a verification affidavit under section 122-1 stating that he was filing the petition in good faith and that "what's stated in arguments are true to the best of my knowledge."

¶ 45     However, our supreme court has held that a section 122-1 verification affidavit generally cannot serve as a substitute for the "affidavits, records, or other evidence" mandated by section 122-2. See *Collins*, 202 Ill. 2d at 66. The supreme court's rationale is that:

"[U]nder the plain language of the Act, the sworn verification described in section 122-1 serves a purpose wholly distinct from the 'affidavits, records, or other evidence' described in section 122-2. The former, like all pleading verifications, confirms that the allegations are brought truthfully and in good faith. [Citation.] The latter, by contrast, shows that the verified allegations are capable of objective or independent corroboration. To equate the two is not only to confuse the purposes of subjective verification and independent corroboration but also to render the 'affidavits, records, or other evidence' requirement of section 122-2 meaningless surplusage. We will not adopt such a reading." *Id.* at 67.

¶ 46    Defendant argues here, though, that under the unique facts of this case he should not be required to provide a section 122-2 affidavit in addition to the section 122-1 verification affidavit. Defendant contends:

"The reason behind the [section 122-2] affidavit or other evidence requirement is for the petitioner, at the first stage, to proffer evidence that indicates there is admissible evidence in support of the claim that can be presented in later proceedings. *** Insofar as a petition bases an ineffective assistance claim on what counsel told [defendant], the petition itself indicates that [defendant] has first-hand knowledge of the facts needed to support his claim, and it would be his testimony that would be required to prove the claim at an evidentiary hearing. [Defendant's] allegations are capable of being substantiated by his own testimony. Therefore, his [verification] affidavit, stating that the facts in the petition are true, is sufficient to provide corroboration to his claim."

¶ 47    Even assuming, without deciding, that defendant's section 122-1 affidavit was sufficient to support his petition, we affirm the dismissal order because the evidence in the record

regarding the plea negotiations belies defendant's uncorroborated argument in his petition that his counsel committed ineffective assistance. Defendant contends in his petition that he would have accepted the State's alleged 10-year offer had his counsel correctly informed him of the consecutive, 20-year minimum sentence he faced for each charge of attempted murder of a peace officer (a total of 40 years). Defendant further states in his petition that even if he was not subject to consecutive sentencing he still would have accepted the 10-year offer if his counsel had told him that he faced a minimum 20-year sentence for conviction of attempted murder of a peace officer. However, during the April 27 pre-trial hearing, at which defendant was present, the assistant State's Attorney and defense counsel informed the court that the State's offer was *not* for a 10-year sentence for pleading guilty to aggravated battery, but instead was an offer of a 20-year sentence for pleading guilty to attempted murder of a peace officer. The assistant State's Attorney and defense counsel further informed the court (in defendant's presence) that the 20-year offer represented the statutory minimum for one count of attempted murder of a peace officer, but that defendant had rejected the offer in favor of a trial on all charges. This recounting of the plea negotiations, which was not objected to by defendant, contradicted his post-conviction argument regarding the nature of the offer relayed to him by his counsel, as well as his argument that he rejected the plea offer because he was misinformed that he faced a minimum sentence of less than 20 years if convicted of all charges. Defendant's petition is subject to dismissal where, as here, its legal theory and factual allegations are completely contradicted by the record. See *Hodges*, 234 Ill. 2d at 16.

¶ 48    Defendant argues that *People v. Barghouti*, 2013 IL App (1st) 112373, and *People v. Paleologos*, 345 Ill. App. 3d 700 (2003), compel a different result. The respective defendants in *Barghouti* and *Paleologos* filed post-conviction petitions alleging that their trial counsel

provided ineffective assistance during plea negotiations by giving incorrect information regarding the sentencing range of the charged offenses, and that they each relied on the incorrect information in rejecting the State's offer. *Barghouti*, 2013 IL App (1st) 112373, ¶8; *Paleologos*, 345 Ill. App. 3d at 702. In each case, the defendant's post-conviction petition was summarily dismissed. *Barghouti*, 2013 IL App (1st) 112373, ¶1; *Paleologos*, 345 Ill. App. 3d at 702. The appellate court reversed both cases and remanded for second-stage proceedings, finding that the allegations of ineffective assistance in each petition were sufficient to survive first-stage review. *Barghouti*, 2013 IL App (1st) 112373, ¶18; *Paleologos*, 345 Ill. App. 3d at 712. Unlike here, though, the respective defendants in *Barghouti* and *Paleologos* had supported their petitions with section 122-2 affidavits, and their allegations were not contradicted by the record. *Barghouti*, 2013 IL App (1st) 112373, ¶9, ¶15, ¶16; *Paleologos*, 345 Ill. App. 3d at 705-06. Accordingly, *Barghouti* and *Paleologos* are factually distinguishable from the present case and do not compel reversal of the post-conviction court's summary dismissal order.

¶ 49    For all the foregoing reasons, we affirm the circuit court.

¶ 50    Affirmed.